Good morning. May it please the court, Bill Markovitz on behalf of Ohio Public Employees Retirement System. I'd like to reserve four minutes for rebuttal. The District Court dismissed OPR's complaint for failure to plead loss causation. In doing so, it rejected a loss causation theory, materialization of the risk, as not adopted by the Sixth Circuit or persuasive to the court. District courts within every circuit, including the Sixth, have accepted materialization of the risk. Every circuit court that has directly addressed the issue has accepted materialization of the risk, and there's good reason for that. As we pointed out in our briefs, a failure to accept materialization of the risk incentivizes fraud and prevents investors like OPR's from recovering for that fraud. A prime example in this case relates to OPR's underwriting allegations. Securities fraud cases based on underwriting misrepresentations are common, including cases brought by FEFA on behalf of Freddie Mac. That's because, as some courts note, underwriting practices would be among the most important information available to investors or looked at by investors. And the Fifth Third Bancorp case within the Southern District of Ohio said, where a company touts but then abandons its conservative loan underwriting standards without disclosing the change, statements concerning its lending policies are materially misleading. Freddie Mac made numerous misrepresentations and omissions relating to its underwriting, falsely claiming that its underwriting was prudent and disciplined when it was neither, and in fact was routinely ignored by Freddie Mac. Freddie Mac's shoddy underwriting was in large part a cause of the loss that occurred on or that was disclosed on November 20th, 2007. I mean, what allegations specifically support that? This is a 12B6 dismissal, right? Yes. So you would have to have allegations in your complaint which establish the cause that you just described. So what would those be? Within our complaint, the allegations with regard to underwriting are set forth in paragraph 2, 152, 156, 167, 170, and 179. And the fact that they were routinely ignored and that there were, in fact, more exceptions than there was observance are set forth in the allegations in paragraphs 11, 58 to 60, 66. I'm sorry. What you just said was that the shoddy underwriting caused the losses. So what paragraph would have that? Actually, that's within those paragraphs, and I'm not sure of the specific paragraph, and it's in the November disclosures. In the November disclosures, and I can point to those specific pages, in the November disclosures, prominent on the financial information statement is that the losses, there were $2.7 billion in credit losses that netted out to a $2.0 billion loss. Continued credit deterioration of primarily 2006 and 2007 loan originations. And that's on document 290.22 at page ID 10991. On the first page of that financial information statement, it says the credit performance of subprime and all-day loans, as well as other nontraditional mortgage products, deteriorated sharply during 2007. And then later on in that document, it says higher levels of foreclosures and delinquencies, particularly with respect to nontraditional and subprime mortgage loans, were a cause of the loss. And it's obvious reading the document that there were $2.7 billion that netted out to $2 billion. There were primarily credit losses based on loan originations. That is a materialization of the risk case. They said they had good underwriting, prudent underwriting, disciplined underwriting, and they were not even following the poor underwriting they had. That's exactly – Practical question. Yes, ma'am. All of this circulates around the single-family portfolio. Is that correct? Primarily the single-family guarantee portfolio, yes. Is there any connection between the retained investment portfolio and the single-family or are we looking at losses within the single – that generated within the single-family investment? It's primarily losses that generated within the single-family guarantee portfolio. Okay. Thank you. They're credit losses that were generated within that. So the underwriting allegations provide a prime example, again, of materialization of the risk. You had a concealed risk, and within the zone of that – Was the higher-than-disclosed proportion of subprime mortgages in their portfolio? Not in the case of the underwriting allegations, Your Honor. The concealed risk there is that if you fail to follow your underwriting, if you have shoddy underwriting – What do you mean by shoddy underwriting, then? Their loan analysis – their underwriting software couldn't even analyze many of the nontraditional loans, and that's set out in those paragraphs that we allege. We go into some detail about the fact that their underwriting, which was automated in a large respect, could not even analyze the loans that they were bringing in. But even apart from that, there's allegations – specific allegations that they failed to follow the underwriting they had, that there were more exceptions. They accepted a lot of loans that did not meet their underwriting standards. I thought most of the statements that you flagged as being untruthful over the course of 2006-2007 were ones that said the proportion of subprime mortgages in Freddie Mac's portfolio, for lack of a better term, was very low, as opposed to the quality of the underwriting for those subprime mortgages. They're both. And, in fact, the district court's opinions acknowledged that we had underwriting allegations at the very beginning of the opinion, but then doesn't address those underwriting allegations. And the foreseeable risk from shoddy underwriting is that you are going to have large credit losses because you're taking in bad loans that haven't met your conservative standards. And I'm just really just trying to understand your theory. Shoddy underwriting – I mean, they weren't – their president wasn't giving statements saying our underwriting is the best in the industry, were they? I mean, I can understand – I mean, was there a statement that would mislead investors about the quality of the underwriting, or were they just simply not doing, you know, as good a job as they should, which sometimes happens to different – It was the former, Your Honor. There are a number of statements set out in the paragraphs that I mentioned where they reassure the market, or attempt to reassure the market in the face of this housing difficulty, that don't worry about us. We minimize our credit losses through prudent underwriting, through disciplined underwriting, which suggests that they're following their underwriting at the very least, which they were not. Again, that gets back to the Fifth Third Bancorp case. If you're touting your underwriting, which is one of the most critical aspects for a mortgage lender, and then you're ignoring your underwriting, that's materially misleading. I don't know whether it's really shoddy underwriting or just the logical outcome of the whole policy that was in effect. HUD is pushing them to give more loans. The Board of Directors is getting huge bonuses by the number of loans they give. I wouldn't call it shoddy underwriting. I would call it intentional underwriting. They were taking a lot of bad loans. And if they were up front about that, if they weren't materially misleading, if they said we're taking – we're not following our underwriting in more than 50 percent of our loans because HUD is pushing us, that would be one thing. The market would understand that and the market would take that into account in the stock price. That's not what they did. Part of the market understood it. That's why they all got credit default swaps and saved themselves from what happened to you. But the market didn't understand it here. And this is a separate point that goes to the other aspect of the case that Judge Kethleck raised, which is the allegations regarding exposure to nontraditional mortgage risk. And I think the primary argument relied on the district court there was that all that risk was disclosed through these credit metrics. Well, there's problems with the credit metrics argument, which has been – which was rejected in SEC versus SIREN, rejected in SEC versus MUD, rejected in In re Fannie Mae securities litigation, accepted in the Curiaco's case. But the central state's decision by the Second Circuit primarily centered upon the disclosure on November 20, 2007. I did want to ask you about that case because the opposing counsel seems to put a lot of importance on that case and they say the allegations are the same, some of the conduct is the same. And I've struggled a little bit to figure out where in this pile of briefs you respond to that directly. You have a footnote somewhere that says we're not going to rehash something, but I couldn't find the original hash. The original hash, Your Honor, it primarily deals with the timing, but there are other aspects. If you look at the central state's opinion, at the very beginning of the opinion, it says at the outset we note that there was this disclosure on November 20, 2007. And so it says it wasn't plausible for central states, given that disclosure on November 20, 2007, it wasn't plausible for them to say that they didn't understand the true gravity of the situation. So they must have been making claims based on decisions they made after that November 20 disclosure? Absolutely, Your Honor. Everything stemmed from that November 20, 2000 disclosure. You guys are pre. And we are pre. We agree that information was disclosed on November 20, 2007 that was a surprise to the market, which is another reason why the credit metrics argument doesn't work. Because if the credit metrics fully disclosed exposure, there would not be a 29% stock drop. The analysts wouldn't have predicted a penny loss when, in fact, there was a $3.29 percent loss. There would be the transparency on page 29 of our brief. There's a chart that shows what happened to other financial institutions during the month before and the month after. There was minimal effect on their stock. The reason is the difference in transparency. Very well. You'll have your rebuttal while you're from the Council. Thank you, Your Honor. Jordan Hirschman for Freddie Mac. The other defendants have ceded their time to me, unless you have a particular question for them. Freddie Mac's public mission is to support the home mortgage market. And it's only allowed to be in one business, and buying mortgage-backed securities, the guarantee portfolio and the retained portfolio. By the way, I just want to point out, just so the Court is aware, Judge Strange, that the statement counsel made about the basis for the $2.7 million losses is incorrect. It's basically half from the guarantee portfolio, half from the retained portfolio. That's in the disclosure document itself. So basic background facts. Freddie Mac discloses we are increasing our purchase of non-traditional mortgage loans. When was this? 2004, 2005, 2006. These are in our briefs. We run through the disclosures. They disclose these loans are going to default at a higher rate. These loans are defaulting at a higher rate. We intend to increase our purchase of these loans. They are risky loans. So it discloses that. I'm struggling a little bit with understanding exactly how they disclosed it. For example, I'm just looking at the mid-2007 report. I'm at page 133.79. And let me just ask the generic question because it's difficult, I know, to get into the grains of this. But what I'm seeing is that you have a FICO score and a current loan-to-value score pie chart. I'm not finding anything in these earlier disclosures that tell you the additive nature of this problem, which, as I understand it, is the plaintiff's claim that it's not one or the other. It's 80% combined with Alt-A. Is that the category? Well, that's exactly how they say it, Your Honor. But I guess I'm going to separate two different points. One of them is what I was just talking about wasn't the disclosure of the credit characteristics, although Freddie Mac did disclose the specific credit characteristics of the loans in its guarantee portfolio. And if you compare those disclosures year to year, you can see exactly how they change. So you can see that they changed in the categories that are independently listed. What I'm looking for is what the definition, I know there's a struggle with the subprime definition, but how one might look at a reasonable definition that includes a combination of factors, not just was it named by somebody who says, I'm a subprime lender, here it is, that's subprime. But the very reality of a subprime loan that would combine FICO, either the Alt-A, loan-to-value ratio, and I'm not finding a way in what has been provided to see how those combine factors. Well, Your Honor, what I would say is there is no fixed definition of subprime, and Freddie Mac didn't use one. Freddie Mac simply didn't buy loans, except for a very tiny amount of selling loans. But Freddie Mac did disclose during the class period the combination of below $620,000 and above $90,000, $10,000 loans, and it was below 1%. So it was a minuscule percentage of the portfolio. Can you give me the record site for that? Yeah, that's a footnote in our brief, and I don't have it at my fingertips, but it's in our brief. But what I was referring to, Your Honor, was the disclosures that are made that in 2005, so that's before the class period, Freddie Mac increased its purchase of non-traditional mortgage loans by 550%. It said, we intend to continue to purchase non-traditional mortgage loans. We warned that they were going to default more often. We disclosed that they did default more often. Is this in the pleadings somewhere? Yeah, absolutely. All of what I'm saying is in our brief. All of these disclosures. This is a 12B6 case, so basically our factual universe is the pleadings. Is what you're saying now in your answer or their complaint or something like that? It is not Rule 56, Your Honor. These documents under the binding law and under Tell Labs are incorporated by reference in the complaint because they are all, all the documents I'm referring to, are cited in the complaint, and therefore they are before this court under Tell Labs on this motion. So what ended up happening on... I mean, it's a 12B6 case, so we can't go off to the races on here's what we think happened in the war. Right, and Your Honor, Judge Pearson didn't go off to the races. Judge Pearson looked at the complaint and the documents incorporated by reference in the complaint. What happened on November 20, 2007 is that Freddie Mac ultimately suffered losses in the midst of the worst decline in home values in recorded United States history, and those losses were simply the materialization of disclosed, not concealed risks. Yes. According to the plaintiffs, Freddie Mac in, I guess, June of 2007 says that only 0.1% of its single family guarantee portfolio is subprime mortgage, when internally Freddie Mac said 12% was. Yeah. They say that in their complaint. Correct. Don't we have to take that as true? No, no, it has to be well pleaded, but more specifically, as it relates to loss causation, and this is where central states come in, Your Honor, that allegation, there's a reason they say very little about central states. That allegation is literally, not similar, it's literally the exact same allegation that was in central states about Freddie Mac. In central states, the investing activity happens after the November disclosure, not before. That would seem to matter, wouldn't it? No, actually, it doesn't matter, Your Honor, on this issue, and this is why. What central states, central, this, plaintiffs do everything they can to avoid this court's law. They're basically saying to this court, we can't address this court's law. I'm not too interested in psychoanalysis of your opponent, because there's a fair amount of this, aspersions in the red brief. I mean, if we could just stick to the merits, why do you think central states is an opposite, or, I'm sorry, applies here? It applies because what the Second Circuit says in central states is we are applying our law, Lentell v. Merrill Lynch, the case that the plaintiffs want this court to adopt, and we are applying it to these exact same factual allegations that the plaintiffs in that case copied from the SEC complaint, and the plaintiffs in this case copied from the SEC complaint, the exact same chart, the 0.1% versus 12%, okay? And what the court there says is that information, whether true or untrue, the allegation that information is not revealed to the marketplace, even as of the conservatorship of Freddie Mack, which occurs a year later. If I may, that would seem to be speaking to this disclosure theory as opposed to materialization of the risk theory. Is that fair? No, it's not, Your Honor, and the reason it isn't is because the Second Circuit was applying its law, and the Second Circuit was applying materialization of the risk law. So in other words, the plaintiffs here are saying, we want you to adopt Lentell v. Merrill Lynch, and I'm saying to you, the Second Circuit in central states applied the materialization risk theory that the plaintiffs are encouraging this court to adopt. They applied the exact law that they want you to adopt, the materialization risk theory, and the Second Circuit said, that's not a materialization of the risk. I mean, believe me, that's a case we will look at very carefully. Let's back up, though. I mean, we've got six circuits, six different circuits that have adopted this theory. True? I actually think that it's four, okay, right? Nobody has rejected it so far. Is that fair? To my knowledge. And you think we should be the first? I think that there isn't any reason for this court to change its existing law. Having said that, I don't think that it would bring about any change in this fact pattern. What I want to, what I'm trying to isolate now is the question whether this theory is valid. And apart from whether, you know, it affects the outcome of this case and so on, just for a moment, you know, we've got four or six circuits that have adopted this theory. Frankly, it kind of looks like a fairly straightforward fraud causation theory, and I want to understand more clearly from you, specifically on the question of theory, why do you think it's wrong? Well, I will point to the discussion, it depends on what it is you're calling materialization of the risk. If we're talking about some broad theory that is saying if what occurred is consistent with the possibility that a fraud occurred, but is also consistent with the possibility that it didn't occur. I don't think the four circuits signed on to that. If we're talking about Lentel itself, Lentel itself, I'm not arguing against Lentel, I argued before the Second Circuit on Lentel. So, but if you look at the fact pattern of Lentel. But I'm not, see, I'm not interested in fact patterns. I mean, unless you're trying to, I want to understand why you think this theory is wrong. And not sort of consistent with the possibility that it's not going to be an adequate ground to find causation. But a theory that is really the one that all these circuits have adopted. I mean, why do you think that is wrong? That's what I'm looking to hear from you. Okay, I'm not. We strike out and say, you know what, we disagree with the second, the fourth, whatever it is down the line, here's why you're wrong. What would we write? I'm not saying that I think that I'm advocating this court has to reject the Lentel approach. I'm fine with this court accepting the Lentel approach. You would not oppose this court adopting a materialization of the risk theory, you just think it doesn't require us to rule against you in this case. Well, first of all, it is wrong to say that Judge Pearson didn't apply it. She did. She said it wasn't persuasive. But what she was talking about was a broader iteration of materialization of the risk is not one fixed theory. Different people have articulated it different ways. Folks have articulated a very broad reading. For example, the plaintiff's reading of it in the argument that he just gave, where there are no disclosures of shoddy underwriting practices. It doesn't happen. There is no revelation of the falsity of any prior statement. There is no revelation of a concealed risk here. That's what the Second Circuit itself held in the Lentel case itself, on the fact pattern there. You obviously are extremely knowledgeable about this stuff more so than I. I thought the whole point of materialization of the risk is there doesn't need to be a disclosure. If Freddie Mac is out there saying, just hypothetically, we have the best underwriting in the industry and that makes our portfolio stronger than others, and it turns out they are disregarding their own internal protocols, their own internal limits on loan-to-value, et cetera, then those omissions could lead to a loss. And the investors who relied on the disclosures about how great the procedures are, the underwriting, would be harmed. And who cares if Freddie Mac didn't own up to it? In fact, there was causation. Isn't that a fair theory of causation? No. It's not. And that's not the Second Circuit law. And I encourage the Court to look at Lentel. What's wrong with that sequence of causation? I mean, that just seems like proximate cause all day long. I mean, what's wrong with that? What's wrong with it is that in a securities case, the Supreme Court has made clear in the DORA case itself that it's simply bad policy to allow the securities laws to be used as investment insurance. But if a company lies to somebody about, say, their underwriting procedures, then is that something Congress meant for there to be no remedy when somebody suffers a loss after they rely upon that statement? Well, that is not the fact pattern here, but putting aside—it seems like the Court wants to just talk in the abstract. Let's say that there's an outright lie, and it never is revealed. There's just bad news that happens. And he didn't rely upon the lie. But that's the front end. That's transaction causation. You hear about these great underwriting procedures and say, I'm getting scared with the way this is. I'm going with them. Meanwhile, the procedures are not happening. Okay. Well, under any iteration of materialization of the risk, there has to be—it doesn't have to necessarily come from a company, but there has to be a revelation that reveals the falsity of the prior statements. Doesn't the Fourth Circuit tell us exactly what that is? Plaintiffs would not need to that corrected the previous misleading disclosure because the news of the materialized risk would itself be the revelation of the fraud that caused plaintiffs' loss. Yeah. Doesn't that do it? No, but it has to be. I refer the Court to Lentell itself. It has to be. I'm asking you about the Fourth Circuit because my count is we've got in here recognizing that theory, D.C. Circuit, Third Circuit, Fourth Circuit, likely the Fifth Circuit, Seventh, Eighth. And all of them are recognizing this as a theory. So my question, I think, and Judge Kethledge's question is, why doesn't the news of the materialized risk itself be the revelation of the fraud that caused the loss? Because it has to be that what it is that's disclosed isn't simply bad news that's consistent with any possible cause of bad news. For example, here, the deterioration of the housing market, or if you look at Lentell itself, the Internet bubble burst and there were losses. And there were disclosures about how these were risky investments, and there's disclosures here about how Freddie Mac was in fact increasing its purchase of nontraditional loans. So the fact that Freddie Mac is increasing its purchase of nontraditional loans, that it says to the marketplace, it discloses the risk. It's not concealed. If home prices decline, we are going to suffer losses. And then there's the biggest decline in home values in recorded United States history, and Freddie Mac suffers a quarterly loss. That is not the materialization of a concealed risk. So it's the materialization of a disclosed risk. So it can't be that any time- But yet, what I understood your argument to be initially in response to Judge Strantz's question is, we don't know that this is actually the materialization of the risk we're complaining about, or they're complaining about. What you just said now was, well, it's a materialization of a disclosed risk, not an undisclosed one, which implies that we can tell after the fact whether a risk that was present on the front end, disclosed or not, has in fact materialized, even absent the company owning up to, yep, it was that risk that caused the- It has to be- Isn't that what kind of you just said? No. What I'm saying, with all due respect, Your Honor, what I'm saying is, a company can on the one hand provide a whole- And if you look at the Lentel case, if you look at these other cases, where there are risks that are disclosed, and the company puts investors on notice that there are risks, and then a loss occurs that is consistent with the disclosed risk, not concealed risks, that can happen. Now, it can happen that there is a loss. That loss doesn't necessarily- It does not reveal the falsity of a prior statement or that a But that's, and Your Honor, this is really why I'm putting a fine point on it. You're saying it could. That's not the materialization of the risk theory that the Second Circuit adopted. What I mean by could is, in a case, it could happen in a case that the risk is, that the loss is clearly traceable after the fact to a particular risk, notwithstanding the company's failure to acknowledge that connection. Yeah, but it's, or it could equally be, in your hypothetical, it could equally be that the loss had nothing to do with any fraud by anybody. It just depends on the facts of the case. In this case, then we have to look at their 12B6. I mean, they've got the commanding heights here in terms of the way we're going to look at the facts, and so we have to look at the facts of this case and say, can, does this show a causal connection between what they say were the nondisclosures or, you know, whatever, and the loss that resulted? And this is why I take you back to Lentel itself. The cases, they, under the Sixth Circuit cases that exist, they lose. Under Lentel, they lose. Why do they lose under Lentel? Because Lentel, first of all, won. You don't even need to theorize about it, because the Second Circuit applied Lentel to these exact factual allegations, literally identical ones, in the central states case. So you see how they apply their law. So if you want to see exactly how they put their law. Check the box. Okay. Okay, now I'm going to talk about the facts of the Lentel case itself for a minute. If that, this is why. I'll tell you why for like 30 seconds. Okay. Well, you say, why do they lose under Lentel? Because the facts there, there you have research analysts putting out analyst reports that are actually touting, are recommending buy for various Merrill Lynch companies, right? And supposedly, there are emails that came out where they actually thought they were bad companies, okay? That's alleged, that's in there, okay? On this materialization, and then of course these stocks went down, all 12B6. On the materialization of the risk discussion, because there's a corrective disclosure discussion, which squarely applies here, there's no corrective disclosure, okay? So they do focus on corrective disclosure also. And then they move on to materialization of the risk as a second piece of their test, a higher test than proximate cause. So if you look at it, you will see they say it's not just proximate cause, it's an added piece. And on the materialization of the risk part, they say, if you look at these reports, what the plaintiffs are doing is they're not taking on the complexity of these reports. These reports, yes, on the one end they say recommend buy, but they also say, this is a risky company, this is a risky investment, here are some of the risks, okay? So in the market, it's a fraud on the market case. All of that information is incorporated into the stock price. And in addition, you have a market-wide event there, just like you have a market-wide event here. And the court says, so here, even though there might be a possibility, we say no, these risks were disclosed to the marketplace, just as in this case. So if this court focuses on these disclosures, the ones that I started with, you will see that the very risks that materialized were the ones that Freddie Mac disclosed. And so their basis for seeking to distinguish central states is completely lacking because the very November 20th disclosures that they point to, that's a stock disclosure Freddie Mac made over a period of years and consistently updated with updated information. That changed. And it was saying, we're buying more non-traditional mortgage loans. And the November 20th, 2007 one was just the most recent iteration of that particular disclosure. So therefore, here you have a materialization of disclosed risks as in the Lentel case, not concealed risks. And that's why they lose on the materialization of the risk also. That's very helpful. Any questions? Very helpful. Trust me, we're going to look at all that very closely. Thank you. What counsel failed to address, as the district court failed to address, are the underwriting allegations that I raised in my initial presentation that have nothing to do with central states that are purely a materialization of the risk and that were ignored by the district court and by counsel in his presentation. That is a materialization of the risk issue. I must say, the impression I got from your blue brief is, and the emphasis seemed to be on the subprime, you say non-disclosure. I mean, that's really what I took away. That was an emphasis. There were five different subject matters. That was one. And with regard to that and materialization of the risk, let me get at the materialization of the risk point, because I believe counsel mistakes the standard under Lentel and its progeny, which is that, let me just get to the gist of it, what he's talking about would turn materialization of the risk into corrective disclosure. What you need under materialization of the risk is a revelation of the risk, not a revelation of the fraud. You have to show that the risk caused the loss, the foreseeable risk. Let me quote from Lentel, a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions. Lentel also talks about the, other cases talk about the subject matter of the misrepresentations and omissions caused the loss. The fraud does not have to be disclosed. Again, if you had to disclose the fraud, then that just incentivizes fraud. People could claim other causes of losses, it just incentivizes fraud. I'm sure that everyone will look closely at the materialization cases and that's what you'll find, and that's the only sensible interpretation of materialization of the risk. Let me get to a point raised by Judge Trench, which gets to the corrective disclosure point in these credit metrics, the credit metric argument, which has been rejected by a number of courts. In the credit metrics, there's very little about what you were talking about, which is termed risk layering. How many low FICO or no DOC are combined with high LTV, and in fact, the credit metrics are incomplete because on November 20th, for the first time, for the first time on November 20th, there was a disclosure of piggyback loans, and that, in and of itself, piggyback loans are, Freddie Mac couldn't, without certain guarantees, issue loans for more than 80% on the loan to value ratio, but what was happening were people were taking out loans for 80% and then another loan for 20%, piggyback loans, so there was 100% loan to value ratio. I mean, in terms of these sort of lulling statements that you point to by various Freddie Mac executives, I don't see anything about, you know, we're not piggybacking, or it seems to be a new, you know, risk, frankly, from the ones I read about. It's a risk of their exposure, and what they said on November 20th, again, for the first time, is here are piggyback loans, and that jumped the loan to value ratio for loans over 90%, from 4% to 14%, and another factor with regard to their disclosures, nowhere during the class period, or on November 20th, is there any disclosure about the number of low documentation loans or no documentation loans? That in and of itself was a basis for a denial of a motion to dismiss in SEC versus Mudd, where Fannie made a similar credit metric argument that was rejected. And what statement to investors was that a lie? These charts don't show the argument of Freddie Mac, and the argument adopted by the district court is that the charts show everything. It shows our full exposure, and the argument that it be lies is that it shows the full exposure. If you don't put down the low documentation and no documentation loans, which create a bias, they're often called liar's loans. If you don't give that metric, people don't have an understanding of your exposure to nontraditional loan loss, and again, the facts support that here if you look at what happened. If you look at the Virginia Bank Sheriff's case says, the Supreme Court case says, and I'm paraphrasing, that if there's true and misleading information and it takes a financial analyst to ferret out the difference between the two, then the information is still misleading. Well, here even the financial analyst couldn't ferret out based on their disclosures what their exposure was to these nontraditional loans. How do we know that the losses that investors and the company itself suffered after the November 20 disclosure were the result of the various risks now that you're complaining about as opposed to things that were disclosed and just part of the risk of investing? How do we get beyond this consistent with idea and actually show that it was because of these risks that you guys didn't tell us about? Well, those risks are emphasized, again, I quoted before from the information statement on November 20, 2007, which emphasized the deterioration due to the investments in nontraditional mortgages. What caused the loss is obviously going to have to be parsed out, but that's an issue, it's a factual issue for determination, not an issue on the pleadings. In this case, what caused the loss, they bring up the housing crisis. There's a small irony there in the Murrah case that we put in our supplemental authority. behalf of Freddie Mac has collected billions of dollars, taking positions that are directly contrary to the position taken here on behalf of Freddie Mac. In those cases, they're saying the housing crisis wasn't ... That was not our case. All right. Well, in this ... I'm sorry, did you ... I was just going to say, though, isn't one of the themes that runs through this that you talk about the underwriting and it was the feeling and the representation that it was prudent and so forth and so on, but the whole concept of underwriting is kind of ... It isn't readily apparent what they do and how they do it and so forth and so on, but in sort of plain English, they're telling you despite all the underwriting and everything, we're buying risky loans, we're buying risky loans. That's just common English, so you can talk about underwriting and everything else, but you were on notice that they're buying risky securities. Judge Geideck brings up a timing issue. They were saying that they were buying these risky securities when the risky securities were popular, when it was necessary for them to buy them, and they said, though, they said we're increasing our participation, but we're covering it with our guarantee fee. They got more fee for these risky securities, and that was fine as long as those risky securities weren't imperiled as they became during the housing downturn. When that housing downturn started and as it started to worsen, they changed tack. You have Mr. Siren on May 14th, 2007 at a financial conference saying, we're staying away from the riskier loan products and those with no documentation. That was false, and we allege that in our complaint, and because of the unique procedural posture of this case, we actually have documents showing that was false. Are you saying this cancels out the earlier disclosures that Mr. Hirshman referred to? You have to look at the timing. Again, the district court ignored the timing. She said, for example, well, they disclosed their increasing participation on November 20th, 2007, but they had already disclosed that on 2006 in their annual report. But in the interim, on May 14th, 2007, to reassure the market, Mr. Siren is saying, we're staying away from the risky loan products and those with no documentation. That was false. There were continual reassurance. We don't have the same exposure. We're better off than our competitors. At the tail end of a three-month period, ending September 30th, with a record $2 billion loss, in end of September, September 10th, Mrs. Cook is saying, don't worry about credit risk. We're better off now than we were last year. That was false, regardless of credit metrics. Mr. Pizzell, the chief financial officer, on September 17th, again, when other companies Is this responsive to your question, Judge Gatton? Well, I suppose it is. It's hard to say. We're kind of going well over time here, so I'll try to just focus on the disclosures. What I was trying to say is, your question brought up the timing issue, and when they made these misrepresentations, the court, the district court ignored those misrepresentations. There's no discussion of our allegations in her opinion. It's all what the disclosures were. But, if you look at what they were saying, the individual defendants were saying, particularly as these other financial institutions were falling with huge losses, that's where November 20th becomes a corrective disclosure, because they're reassuring the market, and then it's disclosed on November 20th, wait, what we said back in September was false. Thank you both for your arguments. Thank you, Your Honor. This will be submitted.